Mr. Justice Hagner
delivered the opinion of the Court:
The defendants Denison and Cushing are sued in their own right; and Denison and Cone, as trustees in a deed of trust from the complainant, of the 13th day of May, 1887. The complainant charges that in May, 1887, she called upon the defendant Denison, a real estate agent, with whom she had no previous acquaintance, informed him she had money to invest, and requested him to act as her agent in its investment in the purchase of real estate in the District; that thereupon Denison undertook to advise with the complainant as to what would be prudent investments, and informed her he thought he could purchase for her certain lots lying near Mt. Pleasant, in the District of Columbia; and exhibited a plat of the land, which had been laid out in lots by Leighton and himself as trustees; that thereafter Denison took her out Sixteenth street extended, to show her the lots he advised her to buy, and when they arrived at the property explained that the lots were located on the west side of Sixteenth street; and, with the map before them, from a point on that street where the vehicle in which they had driven was standing, pointed out to complainant a level plateau, west of Sixteenth street and fronting on Kenesaw avenue, and told her that lots which he advised her to buy, numbered 82, 83 and 84' in the sub-division, were located on that level plateau; that the lots then pointed out by Denison, were eligibly and beautifully situated upon the said plateau fronting south on Kenesaw avenue, and as described and pointed out at the time by Denison were in full view from the point on Sixteenth street extended at which the vehicle then stood; that although the land which consisted of parts of Mt. Pleasant and Pleasant Plains had been sub-divided and plotted by the said trustees, yet on the ground itself there were no marks or stakes by which the location of any particular lot could be definitely distinguished *61 by the eye of a stranger, though the said Denison was well informed, as it was his duty to be, of the location of these particular lots. That thereupon she agreed to purchase lots numbered 82, 83 and 84, believing them to be located on said level ground and plateau fronting on Kenesaw avenue, as described and pointed out by Denison; that he stated the lowest sum the owner would sell the same for was thirty cents per square foot, making the purchase price amount to nine thousand dollars; and the complainant being earnestly advised by Denison to buy, agreed to purchase them at that price, and to pay for the same one-third cash, and the residue in one, two and three years in equal installments. That thereafter Denison named the defendant Nancy W. Cushing, as the owner of said lots; and required the complainant to deposit with him three thousand dollars as the cash payment on the purchase; and thereafter presented to the complainant a deed in fee conveying the lots to her, and she thereupon executed three several notes for two thousand dollars each and also a deed of trust to Denison and Cone, trustees, to secure the deferred payments. That at the time of the purchase and sale of said lots she had no communication with Mrs. Cushing, and she does not remember ever to have seen her; that during the progress of the negotiations and at the time Denison took her out for the purpose of showing her the said lots on Sixteenth street extended, and since that time, the said Denison has frequently represented to the complainant that said lots were very valuable, and the money agreed to be paid therefor would be a safe and sure investment, and though unimproved, .could be readily sold at any time for the price agreed to be paid, and that they were located where real estate was surely increasing in value.
That when the note for the first deferred payment became due she paid it to Denison, and has paid the interest semiannually on all the notes for deferred 'payments up to November, 1888, from the date of the sale in May, 1887; that resting satisfied the lots she had bought and for which *62 deeds had been made to her, were located beautifully on the level ground on the plateau pointed out to her, and trusting to the representation of said Denison, she left the management of the lots, and of other property subsequently bought by him for her, in his hands; and made remittances to him from time to time, when required by him, of such sums of money for payment of taxes and interest as became due on said property; that she remained in Washington City but a short time after the purchase of said lots, living principally since that time in New York and Europe, and only returned to the city of Washington to reside permanently about the 18th day of September, 1889; that she looked upon said Denison as her agent employed and acting in her interest in all of said transactions, and never heard that in the sale of the aforementioned lots he had been employed by and was acting as the agent of the .said Nancy W. Cushing and in her interest and behalf until about the 20th day of September, 1889, whein being in this city for the purpose of looking after her property here, she went out to examine the location of the lots, and then being told that they were not where Denison had informed her they were located, she employed a surveyor to ascertain definitely the location, and was astonished to find she had been wilfully and treacherously deceived by Denison; as she found said lots were located in and upon the sides of a steep ravine, lying as it were in a gorge, and that but a very small part, if any, of them could be seen from the point on Sixteenth street extended where Denison had stopped to point them out to her; that instead of being located on a plateau and on level ground, and being valuable, they were at the time they were sold to her worthless, and are now of little or no value, the same being, as she is informed, not salable; and that it would cost thousands of dollars more than she paid for them to fill them in and make them available for building purposes, or salable; that then for the first time she was informed and discovered that Denison was acting at the time of the sale to her as the agent of said Cushing and altogether in *63 her interests for the sale of the lots, which fact had been kept concealed from the complainant; and complainant says, that both Cushing and Denison now assert that the said Denison was the agent of the said Cushing, and did act as her agent in the sale of the said lots to your complainant; that Denison thus acting as the agent of said Cushing, did, with the intention of deceiving, grossly, treacherously and fraudulently misrepresent the location of said lots for the purpose of inducing the complainant to buy the same, and to pay the large price asked for them, and that by the actings and doings and statements of the said Denison, agent of the said Cushing, complainant was treacherously deceived and fraudulently dealt with, and thereby was induced to purchase said lots, believing them to be differently located than where they are now found to be, and believing them to be valuable lots; and that by reason of such conduct on the part of Denison the sale of the property was effected to the complainant at a price grossly in excess of its value. She prays that the sale and transfer of the lots to her may be rescinded, and the defendants, Cushing and Denison, required to repay and refund to her all the money, principal, interest and taxes paid by her on account thereof, and that the promissory notes given for the deferred payments be delivered up and cancelled; and that the defendants, Cushing and Denison, be enjoined from transferring the promissory notes referred to; and from advertising said lots for sale under the deed of trust referred to.
Mrs. Cushing, in her answer,, stated she had formerly owned the lots described in the bill, and that the same were sold to' the complainant and promissory notes executed, money paid and deed passed; that the sale was conducted by Denison as her agent, and was fairly and honorably conducted; .that he had no interest, except as her agent, in said lots or any of them.
Denison answered, admitting he was in the real estate business as alleged; that in the spring of 1887 the complainant called upon him and expressed a desire to purchase *64 some real estate in the District; that he told her he had some lots for sale belonging to the defendant Cushing, being the same lots mentioned and described in the complainant’s bill, and exhibited to her a plat of the property as it had been survej^ed and recorded; that at the time she purchased, said lots had not been staked out nor were there any landmarks, stakes or monuments to indicate where their boundaries were; that at the time the sub-division and plat were made by the surveyor, the outside lines, including the whole sub-division made by Leighton and himself as trustees, were ascertained, and the sub-division was made and platted as recorded, without surveying and staking out the several lots, and this defendant had no more knowledge or means of knowing the precise location of said lots and their boundaries than any other person who might examine the plat and go upon the ground, and from the range of the streets crossing it, judge approximately where the said lots lay; that he did take the complainant out to look at the property, as stated in the bill, and showed her, as nearly as he was able to, without particularly tracing the lines of said lots by a survey, where the lots lay, but he denies he stated to the complainant that said lots were upon level ground; but on the contrary he alleges that at the time of showing her the said lots he said to her, as he pointed them out, that the ground was uneven and rolling.
He admits the purchase of said lots, but says he was never employed to act as the agent of the complainant; that in selling her the lots he was acting as the agent of the defendant Cushing, and the complainant was so informed; that this defendant had no interest in said lots or the sale of the same, excepting the ordinary commission for making the sale, as the real estate agent of the defendant Cushing; that at the time of making such sale to the complainant, one House of Congress had passed a bill for the creation of a park along Rock Creek, which would be in the immediate vicinity of the said lots, and real estate in that vicinity sold very readily for good prices, and if he had not sold the lots to *65 the complainant he could have easily and readily sold them to other parties at the same price.
He denies that he ever misled, deceived or defrauded the complainant in any manner whatsoever; says the said lots are valuable property; that they do not lie in a gorge, and it would not cost more than the price paid for them to fill them and make them available; that he is informed and believes, and so charges the fact to be, that after this defendant’s wife had taken the complainant to see the property, he took the complainant a second time to see it; that they went upon the' ground, and with the plat of the property before them, the street called Kenesaw. avenue was pointed out to the complainant, and a fence bounding the west side of said lots was shown to her, and she was informed that the lots fronted south on said avenue, and were on the west side of said plat next to the fence; and the defendant alleges that neither by concealing, misdirection, deceit, nor in any other manner, did he mislead, cheat, deceive or defraud the complainant, intentionally or knowingly; that the negotiations and sale were open, fair and honorable on his part.
The case was heard below on the pleadings and testimony, and the bill dismissed; and the propriety of that action by the judge below is the question now before us.
The testimony was voluminous, and applies to all the points presented by the contestants.
First. It was contended the complainant was deceived by Denison’s statements as to the value of the lots in May, 1887, and that thirty cents was a grossly excessive valuation. Seven witnesses were examined as to their value on behalf of the complainant. The statement of John A. Settle, a real estate agent, is that he would not then have given five cents a foot for the lots, and that their present value was no higher. Rudolph H. Evans says no portion of the lots is available for buildings, and that they were worth less than five cents. Mr. Leighton, one of the trustees who made the sub-division, and who sold the lots to Mrs. Cushing, in March, 1887, testified (after Mrs. Cushing and Mr. Deni *66 son had each refused to give the information), that she purchased them at eight cents per foot; that they were the poorest lots on the tract, and the last sold, and that the price obtained was the highest the trustees could get for them. Although we can only look to the record in deciding as to the intelligence and competency of the witnesses, we cannot disregard the fact shown by the proof, that Mr. Leighton is a solicitor of this court and extensively engaged in real estate operations in the immediate neighborhood of these lots; and greater weight would properly be given to his estimates, because of these circumstances. Mr. Pairo, another witness for complainant, also a member of the bar, was one of the syndicate that purchased portions of this sub-division. He says he is thoroughly acquainted with the location of the lots and their value, and that he would not have given over ten cents a foot for them. Joseph R. Hertford, a real estate agent, says the lots were worth, at the time of the purchase, about ten cents a foot. John A. Butler, a real estate agent, states their value at eight cents a foot. Benj. P. Davis, who lives in Mt. Pleasant, very near the property, and says he has been over the place hundreds of times, testified that in the Spring of 1887, the property was worth seven or eight cents a foot. The average of those values is less than eight cents. The only witness examined on the part of the defendants, directly as to the value, was the defendant Denison, who says the lots were worth thirty cents, which is the price at which he sold them to complainant. Mr. McPherson, who is the owner of lots 71 to 81, opposite this property, testifies he bought them at fifteen cents; but makes no statement as to the value of the lots in controversy: assuming, however, that he would have valued them at the price he paid for those he bought, the average of those two estimates would be twenty-two cents.
The average of all the estimates would place the value in May, 1887, at ten cents a foot, instead of thirty cents, which Denison assured the complainant was cheap for the lots.
*67 Second. In considering whether there was a deception practiced by Denison, in his representation to complainant, of the actual location of the lots, the testimony of Mr. Looker, a civil engineer, who informed himself of the lay of the land from actual surveys and levelings, is entitled to great weight. Mr. Looker produced the surveys, with plats showing the topography of the land, with measurements of its inequalities. It appears from his evidence, as well as from the other testimony for the complainant, that Sixteenth street extended runs nearly north from Columbia road, crossing what is called Kenesaw avenue, which traverses this sub-division from east to' west. As we have seen, these lots lie to the extreme west of Sixteenth street extended, and are laid down on the plat as fronting on the north side of Kenesaw avenue. Looker shows that the lots lying immediately' at the intersection of Sixteenth street and Kenesaw are quite level; perhaps a little higher than Sixteenth street. From this point the land begins to slope towards the west and south; and on his plats are circles delineating the rate of fall, at distances of five feet apart, from Sixteenth street to the western boundary.
When the extreme western limit of the land is reached, where lots 82, 83 and 84 are located, their southern front is shown to be forty feet lower than the point of intersection of Sixteenth street and Kenesaw avenue. A large part of their area lies in a ravine, which begins about 180 feet from that point of intersection. The first lot west of the top of the ravine lies just below the average trend of the land; the succeeding lots to the west continue to fall off, until the three lots in question are, reached, on the western extremity of the sub-division, where the bed of Kenesaw avenue is at least forty feet lower than the starting point. So that if Kenesaw avenue alone were filled up to grade at its western limit, it would be forty feet higher than the western portion of these lots; and to build on them after the filling 'of the avenue, would necessitate their being filled to its level. There is -no conflict of testimony upon this point.
*68 Third. This being the state of facts, we are to examine what were the representations made by D.enison to the complainant as to the lay of the land and whether they accorded with the facts.
The complainant and Denison agree that Mrs. Battelle expressed the wish to examine the lots before she should make the purchase and that he took her out in a carriage to show them to hei*. She swears that he halted it on Sixteenth street extended, a little south of the point of intersection of that street with Kenesaw avenue, and from that place professed to point out these lots, as lying in full sight and on a level plateau. It is testified by Mr. Looker, and illustrated by his map, that a person sitting in a carriage, at the point referred to, at six feet above the surface of the road, would be unable, in consequence of the falling off of the ground from that point, to see any part of these lots except a high mound near the extreme north boundary of the most eastern lot — No. 84. Looker further states that the same is true as to every point on Sixteenth street, between Kenesaw avenue and a point 265 feet north of the intersection; and that, until that distance has been traversed, there occurs no place from which one can see, from Sixteenth street, any part of either of the three lots, except this mound on the eastern end of the land.
Mr. Denison denies that the point from which he first showed the lots to Mrs. Battelle was on Sixteenth street at all. .But he admits that, on what he calls his second visit, he did show her the land from a position in that locality. His testimony, on cross-examination, is as follows:
“ Q. You have stated that you drove out a second time with Mrs. Battelle. When was that? — A. It was after the first time. Q. How long? — A. I do not remember how long. Q. Have you any idea; can you tell whether it was a day, a week or a year afterwards? — A. I cannot tell; I know it was not a year by a good deal; I cannot tell how soon it was. Q. State what was the purpose of the drive the second time. — A. She went out and looked around in *69 that direction and drove out that way to this sub-division through Mt. Pleasant. Q. Where did you start from with Mrs. Battelle? — A. I am not certain whether we started from the office or from her house. Q. Who drove with you when you went’with her this second time? — A. I think her two daughters were with her; I drove the carriage myself. Q. What course did you take? — A. Well; I could not state exactly what course' we did take to go out. Q. Did you stop anywhere on that drive to look at the property?- — -A. Yes, we stopped at Sixteenth street extended. Q. Where did you stop? — A. We stopped somewhere near Kenesaw avenue', I think we drove on beyond and came into Park street, as near as I can recollect; I think we drove around Pierce Mill and returned to her home by Tennallytown and Woodley' Inn road. Q. What was your object in stopping near Kenesaw avenue on Sixteenth street ? — A. I think she wanted her daughters to see where the lots were. She pointed and said, ‘there are my Kenesaw avenue lots/ or something to that effect to the daughters.”
And yet, according to Mr. Looker, as we have seen, it is utterly impossible for anybody occupying the position thus described, to see any part of these lots, except the mound near the northern boundary of the eastern lot. Mrs. Battelle, however, denies that she ever made a second visit to the locality with Denison, and her daughters swear positively they never took such a drive as is referred to, or any drive with Mr. Denison.
If Denison made but one visit to the land with Mrs. Battelle, then his testimony above quoted sustains her as to the spot from which he professed to point out the lots.
Denison’s testimony, as to what he calls the first visit, is that after they had reached Kenesaw avenue, they drove to the west of Sixteenth street, upon some vacant land south of Kenesaw avenue, to a point about one-third or one-half the distance between Sixteenth street and the western boundary, and from there he showed her the lots.
In his answer, filed at a time much nearer to the time of *70 the occurrence, he said: “ This defendant has no more knowledge or means of knowing the precise location of said lots and their boundaries than any other person who might examine the plat and go upon the ground and, from the range of the streets crossing it, judge approximately where the said lots lay;” while in his testimony he claims to have pointed out the very lots, and to have said to her, “ there are your lots.” But if the description given of the land by all the witnesses is correct, it seems incredible that Mrs. Battelle, or any person of sane mind, would have bought such lots at such a price after having actually seen the ravine she was invited to buy. No one could look at them without seeing at once they were far below any available grade, much the greater part being in a ravine, forty feet deep at the extremity. Two months before, Denison had conveyed them to Mrs. Cushing, in whose house he had lived, for a consideration not stated in the deed, but really for eight cents. What had since occurred to quadruple the value? The wife of Denison was called as a witness. As a matter of course, her testimony was not admissible, and I shall make no comment upon it. The colored driver, who took Mrs. Battelle out there with Mrs. Denison, says they went on land south of the lots and there Mrs. Denison produced the plat and pointed out the lots “in a general way; there was no ravine we could see from where we stopped to show Mrs. Battelle these lots.”
It is impossible this witness could have been* looking at these lots, if he saw ho ravine, unless every other witness in the case is mistaken as to their location, except Mr. Denison, who in his testimony says: “I don't think there is a ravine there. I think it is below.” This was a repetition of a previous statement by him, soon after the bill was filed, which will now be noticed.
Among the witnesses examined for the complainant was a reporter, who produced his notes of an interview with Mr. Denison immediately after a newspaper publication of the substance of the bill; and testified to their accuracy. Deni *71 son’s statement to the reporter- on this point was, “ there was no ravine there; in some places the land sloped a little and is inclinded to be undulating,- but that is more to its advantage -than hindering it, and certainly did not detract from its valuation.”
Upon the whole case, after giving every possible allowance to the testimony on the other side, we cannot doubt that Mr. Denison professed to point out the location of the lots to Mrs. Battelle from a point from which it has been made perfectly apparent they could not be seen. As one of the trustees, it was his duty to have acquainted himself with the location and character of all the lots he was intrusted to- sell. The previous difficulty of selling these particular lots would naturally have brought them especially to his notice — particularly as he had caused them to be conveyed to Mrs. Cushing two months before. It is almost impossible to believe he was ignorant of their situation and defects. If he suppressed his knowledge to deceive her, his act was a conscious fraud. And it is of course settled that where statements, designedly false, have been made by one party to a contract, to the injury of another, who has accepted and acted upon them as true, to his injury, relief will be afforded in an equity court against its enforcement upon the ground of the absolute fraud, and rescission will be decreed. On the other hand, if, as his answer avers, he had no more knowledge or means of knowing the precise location of the lots than any one else who might examine the plat, why did he not tell her so? Why did he go out there at all, unless he was able to comply with her reasonable request— to be allowed to examine the property in which he was advising her to invest $9,000? If he pointed out property, not knowing whether he was right or wrong, his legal culpability was as great if she was deceived by his statement, as if he had sinned against knowledge, instead of in its absence.
Third. It is held not to be necessary that fraud should have been deliberately practised by the party relying upon *72 the contract, if it appears there have been material misrepresentations in fact, which were accepted as true by the party to whom they were made, to his prejudice. In this case it is contended, as the complainant had the opportunity to take the plat, go to a surveyor before purchasing, and find out exactly the location of the land and thus secure hefself against imposition from Denison’s statements, the court should not interfere. This objection is answered in Bigelow on Fraud, 523, 528, in these words: “ The proposition has now become very widely accepted at law, as well as in equity, that a man may act upon a positive representation of fact, notwithstanding the fact that the means of knowledge were specially open to him, although he had legal notice, as e. g., in the public registry, of the real state of things. * * * If the representations were of a character to induce action, and did induce it, that is enough. It matters not, as it has been well declared, that a person misled may be said, in'some loose sense, to have been negligent (in reality negligence is beside the case where the misrepresentation was calculated to mislead and did mislead); for it is not just that a man who has deceived another should be permitted to say to him, 'You ought not to have believed or trusted me,’ or, ‘ you were yourself guilty of negligence.’ This, indeed, appears to be true, even of cases in which the injured party has in fact made a partial examination. Nor is the rule applicable merely to cases which, in some respects, stand upon special grounds, as, e. g., suits for specific performance; it applies to rescission equally and, indeed, is a general rule.”
Again: “ The rule in private sales, of caveat emptor, has nothing to do with the case; that rule applies only in the absence of fraud. The truth is, the maxim of caveat emptor, in the light of the later and better authority, has been overworked. The rule of law, obscured somewhat in the application of that maxim, is simply this, that both parties to a contract, whether of sale or not, must act the part of prudence; nothing more is required. In the absence of any misleading word or act by the opposite party, this rule re *73 quires each party to satisfy himself before the contract is made; in the presence of a truly misleading word or act, i. e., such as might mislead a prudent man, prudence will be satisfied, if the rule means anything, by the acceptance of that word or act.” The text is supported by abundant authorities, to some of which we will refer.
Schwenk vs. Naylor, 102 N. Y., 683, was the case of a sale of land with question of the location of the line. “ The plaintiff saw it before him, but was not bound then and there to examine the title, especially when the defendant professed to know all about it, and the extent of the property.”
In Redgrave vs. Hurd, 20 Ch. Div., 1, it was said: “Where one person induces another to enter into an agreement with him by a material misrepresentation, which is untrue, it is no defence to an action to rescind the contract, that the person to whom the representation was made had the means of discovering, and might with reasonable diligence have discovered that it was untrue.”
So where the injured party might have learned the representations were false by searching the records of the Patent Office; as in McKee vs. Eaton, 26 Kan., 231.
In Starkweather vs. Benjamin, 32 Mich., 305, the court said: “ It is no defence to an action for fraud in misrepresenting the quantity of land in a parcel the defendant is selling the plaintiff by the acre, that the latter saw the land and was as able to judge of its size as the defendant. A positive assurance of the area of a parcel of land made under such circumstances, is very material, and if it be false, and the vendee is deceived by it, he has a clear right of action for the fraud.”
In Walsh vs. Hall, 66 N. C., 243, it was held that “A purchaser of land is not required, in order to guard against the fraudulent misrepresentations of a vendor, to have a survey made.”
And in Holland vs. Anderson, 38 Mo., 55, it was said, “ Fraudulent misrepresentation and concealment by a vendor of land as to nature, quality, quantity and situation, affecting *74 the whole subject-matter of the contract, will entitle the vendee to relief.”
There is much justice in the position’ assumed by the court in Hale vs. Philbrick, 42 Iowa, 81: “ We are not inclined to encourage falsehood and dishonesty by protecting one who has been guilty of such fraud, on the ground that his victim had faith, in his words, and for that reason did not pursue inquiries which would have disclosed the falsehood.”
“ If the omission to prosecute the examination fully was due to the opposite party’s representations or other acts, that omission cannot be charged against the injured party. It is enough that they were calculated to induce him to rely upon them, and that he did rely upon them.” Bigelow on Fraud, 525:
Fourth. The complainant further insists upon the rescission of the contract, because Denison, while professing to act as her agent in the transaction, was also acting as the agent of Mrs. Cushing; invoking the elementary principle, that if one undertakes to make sale of property as agent of the owner, he cannot at the same time act as agent for the purchaser. The duty and interest of the seller being to insist upon the highest possible price, while the interest of the purchaser is to obtain the property at the lowest rate, the agent cannot serve two masters in such a transaction except to the manifest injury of one or the other. That Denison allowed Mrs. Battelle to understand he was acting as her agent we think is established by the weight of the evidence as to the transaction itself, and by his subsequent conduct. Mrs. Battelle' swears positively she employed Mr. Denison as her agent to invest her money; telling him explicitly she wished him to act in that capacity and purchase land for her; that she had no other agent in the transaction; that he had received from her no other appointment as agent, although he repeatedly paid the taxes on These and other lots he, as her agent, purchased for her subsequently; that confiding in his advice as her man of business, instead of “drawing off” her money from the North in sums of $5,000 per month to *75 pay for the lots, and as she proposed to do, she was persuaded by him to borrow the money on her house on P street, which was conveyed to Denison and Cone in trust; and that with no further employment as agent he continued to correspond with her about her business generally, and frequently advised as to the lots, as appears from the letters produced, in one of which in March, 1888, in reply to a letter asking his advice as to the propriety of advertising the lots, he wrote: “My advice to you is emphatically not to put any of your lots in market now. If you commit yourself to any figure it will have a bad effect.” In an interview with Denison at Mrs. Battelle’s house, when they were about to leave the city, the two daughters swear their mother called them into the parlor and introduced them and said to him: “These are my daughters, Mr. Denison, and I want you to look at them well that you may know them again, for if anything should happen to me, I shall expect you to look after-their interests, as it will be their money that is to be invested.” One of them testifies that twice afterwards she called on Denison at his office and consulted him about the lots, dealing with' him as her mother’s agent.
Mrs. Battelle on two occasions, when he presented his account of receipts and disbursements/ said to Mr. Denison she saw no charge made therein for his services, to which he replied, “ Oh, never mind that now.” As she expected him to sell the property for her and then pay himself, she did not then press the matter further. But even if he had no purpose to make a charge for his services, he would equally be liable for loss to her through negligence or misconduct, if he undertook to act as her agent. Williams’ Exr. vs. Higgins, 30 Maryland, 404.
Surely under the circumstances the complainant was justified by the acts of Denison in concluding he was acting as her agent in the transaction in question, and we believe he really assumed to do so. ,
There are many facts testified to in the case to which we *76 have not adverted, giving an unfavorable aspect to the transaction, as against Denison, and none of an opposite import; but the length of this opinion forbids us to refer to' them here, though the entire record has been carefully examined.
Without prolonging the discussion further, we are satisfied we should grant the relief asked by the complainant, and shall sign a decree to that effect.